UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NACOL & CO., | § | |
| | § | |
|    *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 4:10-CV-00137 |
| | § | |
| ADT SECURITY SERVICES, INC., | § | |
| | § | |
|    *Defendant*. | § | |
| | § | |

### ORDER

Before the court is defendant ADT Security Services, Inc.'s ("ADT" or "defendant") motion for judgment notwithstanding the verdict, or in the alternative to alter or amend the verdict. Dkt. 70. Plaintiff has responded, and has also filed a request for attorney's fees. Dkt. 72. After a review of the motions, the responses, the transcript of trial and exhibits presented, and the applicable law, the motion to alter or amend the verdict is GRANTED in that the verdict is remitted to reflect the contractual limitation of liability agreed to between the parties. The motion for attorney's fees is GRANTED IN PART, but counsel is directed to submit appropriate evidence supporting the reasonableness of his requested fee.

### BACKGROUND

This is an action filed by a jewelry store, Nacol & Co. ("Nacol"), against ADT Security Services, Inc. ("ADT"), with respect to a security system installed at a new store opened by Nacol in the Galleria Area of Houston, Texas. Nacol operated a retail jewelry store at 1727 Post Oak Blvd. in Houston, Texas (Dkt. 1, Ex. B at 2), where it contracted with ADT to monitor its security system. *Id.* Nacol planned to move locations to 5134 San Felipe, Houston, Texas 77078, and therefore contacted ADT to install and monitor its security system at the new location. *Id.* On June 8, 2007,

the parties signed an agreement for the installation and monitoring of a commercial business alarm and including an express undertaking by ADT to provide an Underwriter's Laboratory (UL) certificate for the business, which was desired by Nacol in order to procure insurance coverage against theft or loss. Dkt. 1, Ex. B at 2. ADT installed an alarm system, but did not provide Nacol with a UL certificate. On June 30, 2008, Nacol's jewelry store was robbed. Dkt. 1, Ex. B at 2. At the time of the robbery, ADT had not yet provided Nacol with a UL certificate, and Nacol did not have theft insurance.

On December 9, 2009, Nacol filed its Original Petition against ADT in the District Court of Harris County, Texas. Dkt. 1, Ex. B at 2. Nacol asserted claims for violations of the Texas Deceptive Trade Practices - Consumer Protection Act ("DTPA"), for negligent installation, and for breach of contract. *Id.* at 4. ADT removed the case to this court on January 15, 2010. Dkt. 1.

ADT moved for summary judgment and its motion was denied. The matter therefore proceeded to a jury trial on February 7, 2011. Plaintiff abandoned his claim for negligent installation, and the court granted a defense motion with respect to plaintiff's DTPA claim, finding that this was a breach of contract case only. There is no challenge to the court's ruling on the DTPA claim. The case was submitted to the jury on a breach of contract theory only.

At trial, Paul Nacol, owner of Nacol & Co., testified to the events leading to his agreement with ADT to install an alarm system in the new store.[1] In late May, 2007, a technician met with Nacol at the new store and discussed the wiring that would be necessary for the system. Dkt. 73-1 at 56. Nacol wanted the move to be "seamless" from the old store to the new store, and during

---

[1] Nacol's office manager also testified, but her testimony is cumulative of Nacol's testimony is all relevant respects, and is not recounted here.

2

ensuing discussions with ADT he informed ADT representatives that he wanted installation completed by July 1, 2007. *Id*. at 56-57. Plaintiff introduced a copy of the "sales proposal" for the alarm system that he signed on June 8, 2007. Plaintiff's Exhibit 1. The first page of the "Commercial Sales Proposal Agreement lists the number and type of sensors that would be installed, but Nacol, who had experience purchasing alarm systems for jewelry stores, "was concerned" that the listed equipment would not be sufficient. Dkt. 73-1 at 59-60. Nacol was told by the ADT representative that more equipment could be added at a later date, and that ADT needed the signed agreement to get the major components of the system ordered and to begin installation. *Id*. at 61-62.

The front page of the contact has several hand-written entries, one of which reads, "ADT to provide UL certificate for business." Exhibit 1. Nacol testified that this was part of the agreement, and that he expressly informed ADT representatives that he needed the UL certificate to obtain theft insurance for the store. Dkt. 73-1 at 57.

The contract provided for an installation fee of $4635 payable "upon acceptance" of the proposal. Exhibit 1. At some point, Nacol asked ADT if he could pay the installation fee when installation was completed, and he was told, "Don't worry about that." Dkt. 73-1 at 58. In fact, the installation fee was never paid. Nacol testified that he complained to ADT repeatedly concerning the almost constant problems with the alarm system, and the lack of a UL certificate. Dkt. 73-1 at 64-70. The contract also provided for a monthly charge for ADT's remote monitoring of the alarm system, which was a separate charge from the installation fee, in the amount of $197 per month. Ex. 1.

Nacol testified that he was not given a copy of the sales proposal after he signed it, and that he did not obtain a copy until after he was robbed. Dkt. 73-1 at 62. Nacol admitted that above his signature on the sales proposal is a notice says that "customer agrees to the terms and conditions

3

contained herein, including those on the reverse side." *Id.* at 63. The same provision, in bold, capital letters, also says, "**ATTENTION IS DIRECTED TO THE WARRANTY, LIMIT OF LIABILITY AND OTHER CONDITIONS ON REVERSE SIDE.**" Exhibit 1. Nacol testified that he did not review the conditions on the reverse side, and that he "[n]ever even knew there was a back of it." Dkt. 73-1 at 63. The parties did not discuss or negotiate with respect to the terms on the back of the sales proposal. *Id.* at 63-64.

Plaintiff contacted ADT about the absence of a UL certificate "constantly" during the months following July, 2007. *Id.* at 64. Absent the UL certificate, Nacol could not "find a company that could write [an insurance] policy." *Id.* at 66. Although Nacol realized the risk of operating his store without theft insurance, he did so because he believed he could not close the store simply because ADT was not able to finish installation of the alarm system. *Id.* at 66-67. Nacol's complaints to ADT brought "various responses." *Id.* at 70. Often, a technician would stop at the store before posted business hours and leave a note that no one was there, and this caused Nacol to reschedule the repair appointment. *Id.* "Major portions of the alarm were not complete." *Id.* There were, at times, 3-4 false alarms a night. *Id.*

On June 30, 2008, Nacol's jewelry store was robbed during the day, while it was open, and when the alarm system was deactivated (as it was designed to be during business hours). *Id.* at 72. The parties stipulated that more than $500,000 in jewelry and cash was taken during the robbery. Dkt. 33 at 8.

After the robbery, Nacol contacted another alarm company which installed a system and provided a UL certificate on October 15, 2008. Plaintiff's Ex. 3. He obtained coverage for about $400,000 because he still had not replaced much of the inventory of jewelry on hand after the robbery. Dkt. 73-1 at 70-71. Nacol had approximately $700,000 in inventory at the time of the

4

robbery, and, if he had possessed an alarm system with a UL certificate at that time, he would have obtained coverage for the entire amount. *Id*. at 71. The total amount paid by Nacol for the monthly monitoring charge for the new store (due to "sporadic" billing by ADT) was about $2,000. *Id*. at 72-73.

On cross-examination, Nacol testified that he operated his store without theft insurance from July 2, 2007, until the robbery occurred on June 30, 2008. *Id*. at 76-77. He was also shown a carbon copy of the original contract he signed and identified it as such. Defendant's Exhibit 1A; Dkt. 73-1 at 95. Nacol conceded that he had the opportunity to read the reverse side and the conditions, but did not do so. *Id*. at 96. When asked specifically if he "had the opportunity to read" the back of the contract "if you wanted to at the time you signed it," Nacol answered "Yes, sir." *Id*. at 104. Nacol testified, however, that he did not believe he was accepting all of the terms of the contract, because he knew that changes would be made to some of the equipment, and he had already agreed with the ADT representative that he didn't have to pay the installation fee until after the installation was completed. *Id*. He believes, however, that he read that entire front of the sales proposal. *Id*. at 97. Paul Nacol has been in the jewelry business for 43 years, and dealt with ADT and other alarm services before. *Id* at. 98.

Plaintiff's expert, Don Whitaker, testified that a standard jeweler's block insurance policy provided coverage for robberies. *Id*. at 32. He further testified that Nacol was, in fact, able to procure insurance that included standard coverage for "robbery and theft" after Nacol cancelled its contract with ADT and a new, UL certified alarm system was installed. *Id*. at 34.

ADT witness Todd Buchanan testified that he was the original salesperson who visited with Nacol prior to the time that Nacol opened the new store. *Id*. at 144. He watched Nacol sign the agreement, and Buchanan signed as well that same day, but Buchanan's supervisor singed at a later

time.  *Id.* at 147-48.  Buchanan testified that he left a copy of the agreement with Nacol, and that Nacol had the opportunity to read it.  *Id.* at 150.  In fact, Buchanan asserted that he turned the contract over, and briefly showed Nacol the provisions on the back.  *Id.* at 174.

Buchanan conceded that he knew Nacol needed the system quickly.  *Id.* at 163.  He also testified that he and Nacol had a verbal agreement that Nacol would pay the installation fee when completed and not up front as the contract provided.  *Id.* at 166.  Buchanan identified an ADT business record that reflects that a "UL inspection" was attempted by ADT on 10/14/2008, but that the record contains the notation "tech not qualified for UL inspection."  *Id.* at 172.

ADT also presented the testimony of Sammy Kelly, who testified that it is possible to have an alarm system for a jewelry store that is not UL certified, and still obtain insurance.  Dkt. 73-1 at 193.  He conceded that this would certainly cost more than insurance for a store having a UL-certified system.  *Id.* at 195.

The jury, after three questions during deliberations, returned a verdict for plaintiff.  Dkt. 66.  The jury found that ADT breached the contract, that Nacol did not breach the contract, and it awarded damages in the amount of $535,642.00, reflecting the losses associated with robbery.  *Id.*  The jury declined to award any damages to Nacol for the approximately $2,000 in monitoring fees it paid to ADT.  *Id.*

ADT has filed a motion for judgment notwithstanding the verdict, or to alter or amend the verdict.  Dky. 70.  Nacol responded to the motion, and ADT filed a reply.  Dkts. 71 and 73.  Nacol filed a motion for attorney's fees and costs.  Dkt. 72.  ADT objected to the motion, and Nacol filed a reply.  Dkts. and 77.  Both motions are ripe for disposition, and they will be addressed *seriatim*.

I.  **Motion for judgment notwithstanding the verdict or to alter or amend the verdict.**

LEGAL STANDARD

A judgment as a matter of law is only proper when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the court concludes that reasonable jurors could not arrive at a contrary verdict." *Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 248-49 (5th Cir. 2005) (citation omitted); *see also Rivera v. Union Pac. Ry. Co.*, 378 F.3d 502, 505 (5th Cir. 2004); FED. R. CIV. P. 50(a). "A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Coffel v. Stryker Corp.*, 284 F.3d 625, 630 (5th Cir. 2002) (internal quotations omitted).

Special deference is given to the jury's verdict. *See McClaren v. Morrison Mgm. Specialists, Inc.*, 420 F.3d 457, 461 (5th Cir. 2005); *Mississippi Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 365 (5th Cir. 2002). A verdict of a jury must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury's verdict. *See Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 445 (5th Cir. 2001). The evidence, as well as all reasonable inferences from it, are viewed in the light most favorable to the verdict. *See, e.g., Caboni v. Gen'l Motors Corp.*, 398 F.3d 357, 359 (5th Cir. 2005); *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 445 (5th Cir. 2001). The court disregards all evidence favorable to the moving party that the jury is not required to believe. *See Perez v. Texas Dep't of Criminal Justice, Inst. Div.*, 395 F.3d 206, 215 (5th Cir. 2004).

ANALYSIS

A. **Causation.**

ADT first argues that plaintiff cannot establish causation on the theory that ADT's breach of contract in failing to provide a UL certificate cannot have caused Nacol's failure to obtain

insurance. The court applies Texas law in this diversity case. *Indian Harbor Ins. Co. v. Valley Forge Ins. Grp.*, 535 F.3d 359, 363 (5th Cir. 2008). Under Texas law, a plaintiff is entitled to recover consequential damages for a breach of contract, which are damages that "result naturally, but not necessarily, from the defendant's wrongful acts." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). Such damages are recoverable only if the parties contemplated at the time they made the contract that such damages would probably result from the breach. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). Thus, Nacol was entitled to recover for ADT's failure to provide the UL certificate any foreseeable damages that are directly traceable to the wrongful act. *Arthur Andersen*, 945 S.W.2d at 816.

Here, the testimony at trial from Paul Nacol provides facts from which a the jury could reasonably conclude that the parties knew at the time of contracting that a failure on ADT's part to provide insurance would prevent Nacol from obtaining insurance. The jury could also find from the facts presented at trial that Nacol's failure to obtain insurance, and subsequent loss associated with the robbery, were "directly traceable" to ADT's breach. See, *Metro Allied Ins. Agency, Inc. v. Lin*, 304 S.W.3d 830 (Tex. 2009) (failure of insurance agent to procure insurance policy requested by client can be cause of loss that would have been insured against).[2]

---

[2] ADT relies on *Russell v. Bancroft*, 15 S.W. 282 (Tex. 1891) for the proposition that taking actions that prevent another from obtaining insurance can never establish causation. In *Russell*, the owner of a shingle mill was unable to procure fire insurance because a mill on adjacent property had a burner for castoff material that posed a danger to the shingle mill, and he sued for damages after his shingle mill burned to the ground. *Id*. at 378-79. The Texas Supreme Court denied relief, but the only discussion in the opinion of causation is the court's mention that the burner on the adjacent property was not alleged to have been the cause of the fire at the shingle mill. *Id*. The court can find no guidance in the *Russell* opinion with respect to causation in this case. Apparently, no other court has found guidance from *Russell* in the 120 years it has been a reported decision, since it has never been cited for any proposition, much less the one that ADT asserts.

ADT also asserts that Nacol did not present any evidence that, absent ADT's breach, he would have procured insurance that would have covered his loss from the robbery. ADT relies upon *Lin* in this respect, and notes that the court in that case found that the plaintiff failed to prove that "the CGL insurance that Metro agreed to procure would have actually covered the injury suffered by Lin." 304 S.W.3d at 836. The testimony in *Lin*, however, was much less concrete than the testimony provided in this case. "Lin produced no CGL insurance contract that provides coverage of his breach of contract damages that would have been, or normally was, sold by Metro; no CGL insurance agreement available in the market that would have provided coverage for the claims against him; nor even any expert testimony regarding coverage for indemnity claims under a surety bond in a typical CGL." *Id.* Thus, the court in *Lin* found that the jury would have had to guess at the existence or not of a policy that would have covered Lin's loss because the only evidence at trial was the testimony from the plaintiff's expert to the effect that the coverage that would have been necessary was "rarely" included in a CGL policy. *Id.* at 837.

Here, by contrast, the parties never contested that the coverage at issue was a "jeweler's block policy" that would specifically cover losses for theft. Indeed, the entire purpose of the UL certificate from Nacol's perspective was to obtain that type of insurance. Paul Nacol testified that he obtained an insurance policy when a new company finally installed a UL certified alarm system. Plaintiff's expert, Don Whitaker, testified that jeweler's block insurance provided coverage for robberies, and that Nacol was, in fact, able to procure insurance that included coverage for "robbery and theft" once a new alarm system was installed with a UL certificate. Dkt. 73-1 at 32, 34. This case is distinguishable from *Lin* because Nacol provided the very type of evidence of coverage that the *Lin* court found lacking.

9

Nacol submitted evidence from which the jury could properly find causation in this case. Thus, the court denies ADT's motion with respect to causation.

**B. Contractual limitations of liability.**

In this case, there was some dispute prior to trial about whether the contractual limitation of liability provisions were a part of the agreement because Paul Nacol asserted that he had only been shown the front page of the sales agreement, and that the agreement had been immediately taken away from him after his signature. Dkt. 27-1 ¶ 4. However, in the absence of fraud, misrepresentation, or deceit, a party is bound by the terms of the contract he signed, regardless of whether he read it or believed it had different terms. *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006); *In re McKinney,* 167 S.W.3d 833, 835 (Tex. 2005); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996). Here, the simple fact of the matter is that the evidence presented to the jury permits only a single conclusion in this case, and that is that the entire contract was presented to Paul Nacol, including the contractual limitation of liability clauses, and that he had the opportunity to read the entire contract, but chose not to do so. Texas law does not require a party to a written agreement to discuss or negotiate each and every term thereof before each such term can become a binding part of the agreement. Rather, the opportunity to review the contract prior to signing it is all that is required, particularly where the consumer is himself a business man and experienced in obtaining the services sought in the contract.

The contract in this case contains the following provisions that became part of the contract when Paul Nacol signed the agreement on June 8, 2007:

> IT IS UNDERSTOOD THAT ADT IS NOT AN INSURER. THAT INSURANCE, IF ANY, SHALL BE OBTAINED BY THE CUSTOMER AND THAT THE AMOUNTS PAYABLE TO ADT HEREUNDER ARE BASED UPON THE VALUE OF THE SERVICES AND THE SCOPE OF THE LIABILITY AS HEREIN SET FORTH AND ARE UNRELATED TO THE VALUE OF THE CUSTOMER'S

10

PROPERTY OR PROPERTY OF OTHERS LOCATED ON CUSTOMER'S PREMISES. CUSTOMER AGREES TO LOOK EXCLUSIVELY TO CUSTOMER'S INSURER TO RECOVER FOR INJURIES OR DAMAGE IN THE EVENT OF ANY LOSS OR INJURY AND RELEASES AND WAIVES ALL RIGHT OF RECOVERY AGAINST ADT ARISING BY WAY OF SUBROGATION.

\* \* \*

IF ADT SHOULD BE FOUND LIABLE FOR LOSS, DAMAGE OR INJURY DUE TO A FAILURE OF SERVICE OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE ANNUAL SERVICE CHARGE OR $1000 WHICHEVER IS GREATER, AS THE AGREED UPON DAMAGES; AND THAT **THE PROVISIONS OF THIS PARAGRAPH SHALL APPLY IF LOSS, DAMAGE OR INJURY, IRRESPECTIVE OF CAUSE OR ORIGIN, RESULTS DIRECTLY OR INDIRECTLY TO PERSON OR PROPERTY FROM PERFORMANCE OR NONPERFORMANCE OF OBLIGATIONS IMPOSED BY THIS CONTRACT** OR FROM NEGLIGENCE, ACTIVE OR OTHERWISE, STRICT LIABILITY, VIOLATION OF ANY APPLICABLE CONSUMER PROTECTION LAW, OR ANY OTHER ALLEGED FAULT ON THE PART OF ADT, ITS AGENTS OR EMPLOYEES.

\* \* \*

IF THE CUSTOMER DESIRES ADT TO ASSUME A GREATER LIABILITY, ADT SHALL AMEND THIS AGREEMENT BY ATTACHING A RIDER SETTING FORTH THE AMOUNT OF ADDITIONAL LIABILITY AND THE ADDITIONAL AMOUNT PAYABLE BY THE CUSTOMER FOR THE ASSUMPTION BY ADT OF SUCH GREATER LIABILITY, PROVIDED, HOWEVER, THAT SUCH RIDER AND ADDITIONAL OBLIGATION SHALL IN NO WAY BE INTERPRETED TO HOLD ADT AS AN INSURER.

Dkt. 73-2 at 3 (original capitalized; bold emphasis added). The court must now determine the effect of these provisions on the outcome at trial.[3]

---

[3] Nacol's argument that ADT failed to include jury instructions with respect to the legal significance of these contractual provisions and thereby waived its right to assert that these provisions apply is simply wrong. ADT moved for judgment as a matter of law at the close of plaintiff's case pursuant to Federal Rule of Civil Procedure 50(a)(2). The court denied the motion and, by rule, is "considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). ADT has timely reasserted its motion, and the issues of law raised by ADT during trial are properly before the court.

When parties enter into an agreement based on a writing that is not ambiguous, the court will give effect to the parties' intention as expressed in the writing. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). Under Texas law, "contracting parties can limit their liability in damages to a specified amount" and "it is immaterial whether a limitation of liability is a reasonable estimate of probable damages resulting from a breach." *Vallance & Co. v. Anda*, 595 S.W.2d 587, 590 (Tex.Civ.App.-San Antonio 1980, no writ). And, "[w]hen a burglar alarm company undertakes to provide protective services under terms limiting its liability for the ineffectiveness of the performance of those services, no public policy is violated." *Id.*

Here, the parties expressly agreed, in unambiguous language, that any liability of ADT for a breach of the terms of the contract would be limited to the greater of 10% of the yearly service charge or $1,000. Here, there is no dispute that the greater sum of these two would be $1,000. Nacol does, however, contest the application of this provision on several bases.

First, Nacol argues that the provision applies to a failure of the monitoring of the system, and not to a failure to install the system. Dkt. 71 at 4. However, the provision in question is written more broadly than Nacol suggests. It applies to any claim for "nonperformance of obligations imposed by this contract." Dkt. 73-2 at 3. Whether a provision is ambiguous is a question of law. *See Candlelight Hills Civic Ass'n, Inc. v. Goodwin*, 763 S.W.2d 474, 477 (Tex. App.–Houston [14th] 1988, writ denied). An ambiguity may be patent or latent. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996). A patent ambiguity is one which is evident on the provision's face. *Id.* A latent ambiguity exists when the provision is not ambiguous on its face, but its meaning is uncertain when applied to the subject matter with which it deals. *Id.* There is no ambiguity in this provision, either patent or latent. The provision applies to damages arising from ADT's failure to perform an obligation under the contract. Nacol's theory in this case was that ADT specifically

12

breached the contract by failing to provide a UL certificate. Mr. Nacol's testimony, as well as the express terms of the contract, lead to the inescapable conclusion that the provision of a UL certificate was a specific contractual obligation of ADT:

> Q: I noticed in here [referring to the agreement] it says "ADT to provide UL certificate for business." Do you see that in there?
>
> A: Absolutely.
>
> Q: That was part of the agreement?
>
> A: Absolutely.

Dkt. 73-1 at 61.

Nacol also argues that the parties verbally modified the written agreement. Parties can, of course, modify even a fully-integrated contract by oral agreement, and "[c]ourts have allowed oral modification in spite of the parties' no oral modification clause, reasoning that the written agreement is of no higher legal degree than an oral one, and either may vary or discharge the other." *Am. Garment Props., Inc. v. CB Richard Ellis-El Paso, L.L.C.*, 155 S.W.3d 431, 435 (Tex.App.–El Paso 2004); see also *South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1118 (5th Cir. 1984) ("Texas law permits a contract to be modified by subsequent oral agreement, notwithstanding the inclusion of a no-oral-modification clause, if the contract is not required by law to be in writing to be enforceable.").

Here, Paul Nacol testified that he was not expected to, and did not, make immediate payment for installation upon signing the agreement, even though the contract expressly called for immediate payment. Nacol also testified that he and the ADT representative both understood at the time the contract was signed that more or different equipment than that which was listed on the face of the contract might be needed, and that the parties would alter the contract as needed in this respect. While these two asserted oral modifications of the parties' written agreement certainly establish that

the parties were open to modifying the contract's terms, plaintiff did not present to the jury any evidence that the parties modified the limitation of liability provision. In fact, Nacol admitted that he never read the provision, so it is not surprising that he gave no testimony concerning discussions with ADT personnel about modifying that provision.[4]  Therefore, absent any evidence of modification of the limitation of liability clause by the parties, that clause stands as written.

The parties agreed to limit ADT's liability for breach of the contract to the greater of 10% of the yearly monitoring fee or $1,000. In this case, the greater sum is $1,000. The jury's verdict is, as a matter of law, unsupportable to the extent that it exceeds the contractual limit of liability, and will be reduced accordingly.[5]

### C. Attorney's fees.

As noted above, this is a diversity case involving application of state law. "State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002). Pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(7), Nacol "may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs" for a breach of contract. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(7) (Vernon 2002). An award of reasonable attorney's fees is mandatory if there is proof of the reasonableness of the fees and the plaintiff has been awarded

---

[4] Nacol would have had to provide evidence of such discussions, as he did with respect to the timing of his obligation to pay the installation fee, because a valid modification requires proof that both parties intended to modify the contract, and assented to the modification. *Mid Plains Reeves, Inc. v. Farmland Indus., Inc.*, 768 S.W.2d 318, 321 (Tex.App.-El Paso 1989, writ denied); *Mandril v. Kasishke,* 620 S.W.2d 238, 244 (Tex. Civ. App .-Amarillo 1981, writ ref 'd n.r.e.).

[5] ADT also seeks to void the jury's award of damages in its entirety by relying on a contractual provision disallowing any damages for "delay" in installation. As noted above, the claim in this case, and the jury's verdict, was premised not on any delay in installation, but on ADT's clear failure to comply at all with its contractual obligation to provide a UL-certified alarm system. The delay provision is simply inapplicable.

14

damages. *Mathis*, 302 F.3d at 462 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 2002)). Nacol bears the burden of proving reasonableness of the fees and of providing sufficient documentation to support an award. *Pelt v. U.S. Bank Trust Nat'l Ass'n*, 259 F.Supp.2d 541, 542 (N.D. Tex. 2003).

The court has broad discretion in determining reasonableness, and may consider a wide range of factors, including: (1) the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). The court may look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties in determining the reasonableness of the attorneys' fees. *Burnside Air Conditioning & Heating, Inc. v. T.S. Young Corp.*, 113 S.W.3d 889, 897 (Tex.App.-Dallas 2003, no pet.). The determination of reasonableness and calculation of the proper fee award is left to the court's discretion, but is guided by "a rebuttable presumption of reasonableness for fees that are 'usual' or 'customary'" and the ability of the court to "take judicial notice of the 'usual and customary fees' and the contents of the case file." *Id*. (citing TEX. CIV. PRAC. & REM. CODE ANN. § 38.003-4 (Vernon 2002)).

In this case, plaintiff seeks a total of $165,000 for the services of counsel through trial. Plaintiff's counsel does not provide any records of his hours expended, but provides an "estimate" of his time expended of 330 hours through judgment in this case. Dkt. 72-1. In an exhibit to his affidavit, counsel provides what can best be described as a perfunctory attempt to itemize the time expended by asserting, e.g., that he spent "70 hours" preparing for and attending trial and dealing with motions and pleadings during trial. *Id.* at 5. Counsel does not provide any dates, nor does he break out the hours expended on any particular subject. While it would be possible for the court in some cases to review the case file and determine that 330 hours of attorney time is "reasonable and customary," ADT makes a very persuasive argument that the file in this case is thin. There was little in the way of discovery, or motions practice, and trial involved a handful of witnesses and exhibits. Absent more specific documentation of counsel's actions in this case, 330 hours *seems* excessive.

Plaintiff is certainly entitled to recover reasonable attorney's fees under Texas law, but it is his burden to come forward with documentation supporting the reasonableness of the award. "If the documentation is vague, lacking, or incomplete, the district court may reduce the number of hours awarded." *Pelt*, 259 F.Supp.2d at 542 (citing *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), cert. denied, 516 U.S. 862, 116 S.Ct. 173 (1995)). The documentation presented by plaintiff is insufficient for the court to make a determination of reasonableness, particularly since two of the three counts of the original complaint were dismissed, and plaintiff's success on the contract claims is quite limited. Therefore, the motion for attorney's fees is GRANTED, but the court will withhold setting an amount of fees, and will instead direct plaintiff to submit more specific documentary support for the award of attorney's fees he requests, unless the parties are able to come to an agreement with respect to the amount of attorney's fees to be awarded.

## CONCLUSION

After consideration of ADT's motion for judgment notwithstanding the verdict, or in the alternative to alter or amend the verdict (Dkt. 70), the response, the reply the applicable law and the evidence presented at trial, the motion is GRANTED in that the jury's verdict is REMITTED to reflect an award of damages in plaintiff's favor and against defendant ADT in the total amount of $1,000.

It is further ORDERED that plaintiff's motion for attorney's fees (Dkt. 72) is GRANTED IN PART, but plaintiff is directed to submit appropriate evidence supporting the reasonableness of the requested fees on or before April 29, 2011.

It is so ORDERED.

Signed at Houston, Texas on April 21, 2011.

_____
Gray H. Miller
United States District Judge